**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | | |
|---|---|---|
| MARSHAUN BOYKIN (#R-54017), | ) | |
| | ) | |
| PLAINTIFF, | ) | CASE NO. 16 CV 50160 |
| | ) | |
| V. | ) | |
| | ) | HON. THOMAS M. DURKIN |
| DRS. MARK FISCHER AND | ) | |
| RAMON MARQUEZ, | ) | |
| | ) | |
| DEFENDANTS. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

### I.    Introduction

Plaintiff Marshaun Boykin, an inmate in the custody of the Illinois Department of Corrections ("IDOC"), has brought this currently *pro se* prisoner civil rights action pursuant to 42 U.S.C. § 1983.   Plaintiff claims that Defendants, two psychiatrists at the Dixon Correctional Center, have violated his constitutional rights by acting with deliberate indifference to his mental health needs.   [All other Defendants have been dismissed on threshold screening, by amendment, pursuant to voluntary dismissal, or through settlement.]   Plaintiff principally challenges his placement in Dixon's Psychiatric Unit.

Currently before the Court is Defendants' motion for summary judgment. Although advised of his opportunity to respond to the motion, *see* R. 166, briefing schedule entered August 14, 2019; R. 168, Order of September 13, 2019, Plaintiff has declined to file an opposing brief.   For the reasons discussed in this order, Defendants' uncontested motion for summary judgment is granted.

### II.    Plaintiff's *Pro Se* Status

The Court is compelled to note at the outset that it normally would have recruited counsel in a prisoner civil rights action involving mental health treatment.   To be sure, *pro bono* counsel represented Plaintiff for the first two years

this case was pending, marshalling the evidence and expending close to half a million dollars in doing so.  R. 105, Motion to Withdraw, at p. 1.

However, as occurred in many of Plaintiff's lawsuits in this district, the Court ultimately allowed counsel to withdraw from this case after Plaintiff clashed with his *pro bono* attorneys and their support staff.  *See* R. 112, Minute Entry of July 17, 2018 (Johnston, J.).  The magistrate judge previously assigned to this case declined to recruit new counsel.  *Id.*  The district judge who presided over this case prior to his retirement likewise refused to enlist another attorney.  R. 114, Order of August 6, 2018 (Kapala, J.).  Given Plaintiff's "inexcusable and unfounded conflict" with counsel, his defamatory aspersions against them, his warnings that he intended to report them to the State Bar's disciplinary commission—and even threats of bodily harm—the Court concluded that Plaintiff seemed "incapable of working with an attorney."  *Id.* at p. 2.  The Court additionally observed, based in part on Plaintiff's ability to bring [at that time] 37 lawsuits in this district alone since 2012, that he appeared to have the wherewithal to litigate this matter without the assistance of an attorney.

The undersigned judge, too, decided against recruiting new counsel.  *See* R. 162, Order of June 25. 2019 (Durkin, J.).  The Court noted that in all four of Plaintiff's then-pending cases, he had either fired *pro bono* counsel or they were relieved from assignment due to discord with Plaintiff.  *Id.* at p. 2.  And the Court cited additional, earlier cases where "Plaintiff's counsel admirably fulfilled their professional duties and Plaintiff incorrectly and unreasonably believed otherwise," or where he otherwise engaged in "unreasonable conduct toward recruited counsel. *Id.* The age of this case also militated against generating any more delays. *Id.* at p. 3.

Moreover, the Court was, and remains, satisfied that Plaintiff was capable of navigating this matter on his own, notwithstanding his mental illness.  *Id.*, at p. 3 (citing *Romanelli v. Suliene*, 615 F.3d at 847, 849 (7th Cir. 2010) (quoting with approval the district court's assessment that the "whole point" of psychotropic drugs

2

is to allow the person taking the medication to think and act rationally)); *see also Boykin v. KSB Hospital*, Case No. 18 CV 50371, R. 4, Order of December 10, 2018, at P. 3 (Kapala, J.) (commenting that Plaintiff alluded to his mental health issues only when it seemed to suit him). Plaintiff has shown himself to be a highly intelligent individual and a savvy litigator. He managed to file numerous lawsuits over the course of several years without "striking out" under 28 U.S.C. § 1915(g) until 2017, and he achieved settlements in at least ten of his cases. Plaintiff also expressly demanded to proceed in this case *pro se* at one point.

## III. Legal Standards on a Motion for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Hanover Ins. Co. v. Northern Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014). In determining whether factual issues exist, the Court must view all the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Weber v. Univ. Research Assoc., Inc.*, 621 F.3d 589, 592 (7th Cir. 2010). The Court does not "judge the credibility of the witnesses, evaluate the weight of the evidence, or determine the truth of the matter. The only question is whether there is a genuine issue of fact." *Gonzalez v. City of Elgin*, 578 F.3d 526, 529 (7th Cir. 2009) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 249-50 (1986)).

To survive summary judgment, the nonmoving party must make a sufficient showing of evidence for each essential element of his case on which he bears the burden at trial. *Blow v. Bijora, Inc.*, 855 F.3d 793, 797-98 (7th Cir. 2017) (citing *Celotex*, 477 U.S. at 322-23). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Blythe Holdings, Inc. v. DeAngelis*, 750 F.3d 653, 656 (7th Cir. 2014) (citations omitted). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Johnson v. Manitowoc Cty.*, 635 F.3d 331, 334 (7th Cir. 2011) (quoting

*Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 640-41 (7th Cir. 2008)).

## IV. Northern District of Illinois Local Rule 56.1

Local Rule 56.1 (N.D. Ill.) governs the procedures for filing and responding to motions for summary judgment in this judicial district. "Under the Local Rules of the Northern District of Illinois, a party filing a motion for summary judgment under Fed. R. Civ. P. 56 must serve and file 'a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law.'" *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 (7th Cir. 2008) (citation omitted). The opposing party must then file "'a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon.'" *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) (citing N.D. Ill. R. 56.1(b)(3)(B)); *Fabiyi v. McDonald's Corp.*, No. 11 CV 8085, 2014 WL 985415, at *1 (N.D. Ill. Mar. 13, 2014) (*aff'd* 595 F. App'x 621 (7th Cir. 2014)). The opposing party may also present a separate statement of additional facts that require the denial of summary judgment. *See Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643-44 (7th Cir. 2008).

If a party fails to respond to a L.R. 56.1 statement of uncontested facts, then those facts are deemed admitted to the extent they are supported by the evidence in the record. *Keeton v. Morningstar, Inc.,* 667 F.3d 877, 880 (7th Cir. 2012); *Parra v. Neal*, 614 F.3d 635, 636 (7th Cir. 2010); L.R. 56.1(b)(3)(C) (N.D. Ill.) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party."). A plaintiff's *pro se* status does not excuse him from complying with these rules. *Morrow v. Donahoe*, 564 F. App'x 859, 860 (7th Cir. 2014) (unpublished opinion) (citing *Pearle Vision, Inc. v. Romm,* 541 F.3d 751, 758 (7th Cir. 2008) (inter alia)).

However, a non-movant's failure to respond to a summary judgment motion, or failure to comply with L.R. 56.1, does not automatically result in judgment for

4

the movant. *Keeton,* 667 F.3d at 884; *Love v. Rockford Illinois Mun. Police Dep't*, No. 08 CV 50254, 2013 WL 159246, at *1 (N.D. Ill. Jan. 15, 2013). The movant must still demonstrate that it is entitled to judgment as a matter of law. *Keeton,* 667 F.3d at 884; *Love*, 2013 WL 159246, at *1. And the Court still views all the facts asserted by the moving party in the light most favorable to the non-moving party, drawing all reasonable inferences in the non-movant's favor. *Keeton,* 667 F.3d at 884; *Love*, 2013 WL 159246, at *1.

Consistent with the Local Rules, Defendants filed a Statement of Material Facts along with their motion for summary judgment. (R. 173, Defendants' Local Rule 56.1(a) Statement.) Each substantive assertion of fact in Defendants' Local Rule 56.1(a)(3) Statement is supported by evidentiary material in the record. Also in accordance with the Local Rules, Defendants filed and served on Plaintiff a Local Rule 56.2 Notice, which explained in detail the requirements of Local Rule 56.1. (R. 176, "Notice to *Pro Se* Litigant Opposing Motion for Summary Judgment.") The notice warned Plaintiff that a party's failure to controvert the facts as set forth in the moving party's statement results in those facts being deemed admitted. *See also Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).

## V. Uncontested Facts

In view of Plaintiff's failure to respond to Defendants' motion for summary judgment, the Court finds that the following facts, all supported by the record, are undisputed for purposes of the summary judgment motion:

Plaintiff Marshaun Boykin (incarcerated under the surname "Boykins") is an Illinois state prisoner. (R. 173, Defendants' Local Rule 56.1(a) Statement of Material Facts, ¶ 1.)

Defendants Mark Fischer and Ramon Marquez are psychiatrists employed at the Dixon Correctional Center. (*Id.*, ¶¶ 2, 3.) In their position as staff psychiatrists, Defendants provide mental health treatment for inmates. (*Id.*)

Plaintiff has been diagnosed as seriously mentally ill. (*Id.*) He suffers from

5

various psychiatric conditions, including mood disorder, bipolar disorder, depression, impulse control disorder, and antisocial personality disorder. (*Id.*)

Prior to the initiation of this lawsuit, Plaintiff's mental health care providers at the Pontiac Correctional Center determined that a residential treatment center would be a better home for him than a regular prison. (*Id.*, ¶ 4.) Residential treatment units—essentially a secure hospital setting—are specifically equipped to handle seriously mentally ill prisoners by providing programs and access to staff not available at regular prisons. (*Id.*) Defendant Fischer agreed with the assessment of Pontiac psychiatrists that it was "medically appropriate" for Plaintiff to be housed in a residential treatment unit setting due to his various mental health issues. (*Id.*)

Before inmates are admitted to a residential treatment unit, they are afforded an opportunity for a placement hearing if they wish. (*Id.*, ¶ 5.) In addition, an inmate may, at any time, request a review of his or her placement by submitting a request in writing to the prison administration, submitting a grievance, or asking a mental health care provider for a review. (*Id.*) And with or without a request, all inmates housed in a residential treatment unit undergo placement review at least every six months. (*Id.*)

The Dixon Correctional Center has two residential treatment units, the Special Treatment Center and the Dixon Psychiatric Unit. (*Id.*, ¶ 6.) The Special Treatment Center houses inmates with minimum and medium security classifications. (*Id.*) The Dixon Psychiatric Unit houses maximum security inmates. (*Id.*)

Inmates housed in the Special Treatment Center share a cell with a fellow prisoner. (*Id.*). Inmates in the Dixon Psychiatric Unit occupy single-person cells. (*Id.*) Otherwise, inmates in the Special Treatment Center and the Dixon Psychiatric Unit are both provided the same level of access to mental health providers, therapeutic programs, and medical treatment. (*Id.*, ¶ 8.) Both the Special Treatment Center and the Dixon Psychiatric Unit offer the same basic

6

mental health treatment programs, including at least 10 hours per week of "structured" out-of-cell-time. (*Id.*) Structured out-of-cell time can include one-on-one or group therapy with a counselor. (*Id.*) Residents in both the Special Treatment Center and the Dixon Psychiatric Unit are also afforded at least 10 hours per week of unstructured out-of-cell time. (*Id.*) Unstructured activities include access to the prison yard, gym, and law library, as well as access to psychologists, psychiatrists, social workers, and other mental health professionals. (*Id.*)

Security classifications are based at least in part on the length of an inmate's sentence. (*Id.*, ¶ 7.) Under prison guidelines, inmates with more than 25 years until their mandatory supervised release date are automatically designated as maximum security inmates. (*Id.*) Ultimately, the prison administration, and not the mental health care staff, determines an inmate's housing placement. (*Id.*)

When Plaintiff first arrived at Dixon, he was housed in the Special Treatment Center and remained there for several years. (*Id.*, ¶ 9.) At that time, he was serving a 14-year sentence for residential burglary. (*Id.*, ¶ 1.) However, in early 2015, Plaintiff was sentenced to two additional, consecutive 35-year terms for predatory criminal sexual assault of a child. (*Id.*, ¶¶ 1, 9.) Plaintiff's projected mandatory release date was accordingly pushed back to November 2077. (*Id.*, ¶ 9.) Due to his 70-year sentence, Plaintiff was reclassified as a maximum security inmate pursuant to IDOC policy. (*Id.*) Consequently, he was transferred from the Special Treatment Center (minimum/medium security) to the Dixon Psychiatric Unit, a maximum security facility. (*Id.*)

Defendant Fischer was not involved in the decision to categorize Plaintiff as a maximum security prisoner. (*Id.*) However, based on Dr. Fischer's familiarity with Plaintiff—and after reviewing his mental health records and discussing the matter with other staff members—Fischer did agree, when asked, that it was "medically appropriate" for Plaintiff to be placed in a residential treatment unit. (*Id.*, ¶ 10.)

Plaintiff moved to the Dixon Psychiatric Unit on or about April 13, 2015.

7

(*Id.*)  Dr. Fischer met with Plaintiff on the day of his arrival.  (*Id.*, ¶ 11.)  Plaintiff, demonstrating a keen knowledge of pharmaceuticals, requested that he receive Prozac (generic name fluoxetine, an antidepressant), Depakote (or divalproex sodium, a mood stabilizer aimed at controlling manic episodes caused by bipolar disorder, Haldol (haloperidol, an antipsychotic medication), Cogentin (benztropine, a drug used to combat spasms and involuntary movements), Trazodone (a sedative and antidepressant), and Lorazepam (brand name Ativan, a calming and anti-anxiety agent.  (*Id.*)  Plaintiff confided to Fischer that he was fixated on his 70-year sentence and was having thoughts about hanging himself.  (*Id.*)

Because Plaintiff expressed statements of self-harm, Dr. Fischer placed him on a 10-minute suicide watch.  (*Id.*)  Dr. Fischer also prescribed all of the psychotropic medications Plaintiff had requested.  (*Id.*)  Dr. Fischer hoped that the medications would help steady Plaintiff's mental health conditions.  (*Id.*)

Fischer saw Plaintiff again the next day.  (*Id.*, ¶ 13.)  Plaintiff was by that time preoccupied with obtaining a transfer back to the Special Treatment Center. (*Id.*)  Plaintiff reported that he was feeling better, and that he was no longer experiencing any suicidal ideations.  (*Id.*)  Dr. Fischer adjusted Plaintiff's status to a 30-minute suicide watch and continued his various mental health medications. (*Id.*)

Fischer had a follow-up appointment with Plaintiff a week later.  (*Id.*, ¶ 14.) At that time, Plaintiff stated that he did not believe his medications were helping. (*Id.*)  He requested an increased dosage of Haldol.  (*Id.*)  He disclosed that he had not taken his medications for several days in order to create a reason for Dr. Fischer to see him.  (*Id.*)  Nevertheless, Plaintiff said that he was doing better and did not have any suicidal thoughts.  (*Id.*)  Dr. Fischer increased Plaintiff's Haldol per his request and continued the other mental health medications.  (*Id.*)

The next day (April 23, 2015), Plaintiff told Dr. Fischer that he continued to feel better, but that he was hearing voices.  (*Id.*, ¶ 15.)  Despite feeling sleepy and tired, Plaintiff said that his mood was good and that he did not have any suicidal

8

ideations. (*Id.*) Dr. Fischer continued Plaintiff's medications, deeming them appropriate for the inmate's mental health needs. (*Id.*)

At an appointment the following day, Plaintiff reported that he had been moved to the Dixon Psychiatric Unit's A-Wing. (*Id.*, ¶ 16.) [The Court gathers from Defendants' Statement of Facts in its entirety that the A-Wing unit offers the most freedom and privileges, that B-Wing may or may not be a step down, and that C-Wing is a disciplinary and observation unit.] Plaintiff said that he was not feeling suicidal, that he had been to the yard, and that he intended to go the gym as soon as he was able to do so. (*Id.*)

When Plaintiff met with Dr. Fischer on April 30, 2019, he requested permission to stop taking Haldol. (*Id.*, ¶ 17.) Plaintiff said that he did not think the Haldol was effective. (*Id.*) Accordingly, Dr. Fischer decreased Plaintiff's dosages of Haldol and Cogentin, but increased his dosage of Lorazepam. (*Id.*)

On May 8, 2015, Plaintiff told Dr. Fischer that he wanted to be in group therapy and reiterated that he wanted to return to the Special Treatment Center. (*Id.*, ¶ 23.) Plaintiff was frustrated and angry at that time, but he did not convey any suicidal ideations. (*Id.*) After examining Plaintiff and discussing his course of treatment, Dr. Fischer discontinued his Haldol and Cogentin, increased his Lorazepam, and prescribed Bupropion (brand name Wellbutrin, an antidepressant often prescribed to those with obsessive-compulsive disorder) and Gabapentin (Neurontin, a drug used to control neuropathic pain), with orders to stop Depakote once the Gabapentin started. (*Id.*) Dr. Fischer also continued Plaintiff's Prozac and Trazodone. (*Id.*) Wellbutrin, Gabapentin, Prozac, and Trazodone are all used to treat depression. (*Id.*) Lorazepam is used to calm patients who suffer from impulsivity and anxiety. (*Id.*, ¶ 24.)

On May 11, 2015, Dr. Fischer discontinued Plaintiff's Depakote and adjusted his Gabapentin dosage. (*Id.*, ¶ 25.) In addition, Dr. Fischer ordered that Plaintiff receive his Wellbutrin in crushed form. (*Id.*) Dr. Fischer did so because Plaintiff had a history of "cheeking" and hoarding his medications—that is, pretending to

9

take his medications but instead keeping them for later use. (*Id.*) Hoarding medications presents a danger to inmates of overdosing. (*Id.*) Wellbutrin in particular is known to be abused to obtain a recreational high, which Dr. Fischer says can harm a patient. (*Id.*)

On May 12, 2015, Dr. Fischer explained to Plaintiff that his Gabapentin and Wellbutrin were approved through a non-formulary process (presumably meaning that neither was on the list of drugs generally made available to IDOC inmates). (*Id.*, ¶ 26.) Plaintiff reported that he did not want his medications to be crushed because he did not like how they tasted. (*Id.*) Other than complaining about the taste of his crushed medicines, Plaintiff was calm and did not have any "particular issues." (*Id.*) Dr. Fischer continued Plaintiff's multiple prescriptions.

On May 28, 2015, Plaintiff asked for an increase in his Gabapentin. (*Id.*, ¶ 27.) Plaintiff reported that he spent a large portion of the day sleeping, but said that he was otherwise doing well. (*Id.*) Plaintiff did not express any suicidal ideations. (*Id.*) However, when Dr. Fischer reviewed Plaintiff's medication records, he discovered that Plaintiff had been non-compliant with his drug therapy and missed some recent doses. (*Id.*) Dr. Fischer discussed with Plaintiff the need to fully conform to his medication schedule in order for the drugs to work properly. (*Id.*)

On June 9, 2015, Plaintiff told Dr. Fischer that he was depressed and that he lacked energy in the morning. (*Id.*, ¶ 28.) Plaintiff was troubled about the length of his sentence. (*Id.*) Dr. Fischer examined Plaintiff's medication records and discovered that he had missed approximately a quarter of his doses since the first of that month. (*Id.*) Dr. Fischer performed a physical exam of Plaintiff, who showed no elevated or manic mood. (*Id.*) The doctor adjusted and continued Plaintiff's prescribed medications as he deemed appropriate to address Plaintiff's mental health needs and stabilize his conditions. (*Id.*)

At an appointment a week later, Plaintiff stated that he did not want to take his Wellbutrin because the pills were pink in color, not purple as he preferred. (*Id.*,

¶ 29.)  Plaintiff was still very concerned about, and having trouble coping with, the length of his sentence.  (*Id.*)  Dr. Fischer again noted that Plaintiff had been non-compliant with his medications for the prior ten days. (*Id.*)  Dr. Fischer again adjusted, in part, and renewed, in part, Plaintiff's prescribed medications.  (*Id.*)

On August 6, 2015, the prison staff conducted a housing assignment review for Plaintiff.  (*Id.*, ¶ 18.)  The administration asked Dr. Fischer whether he considered Plaintiff's placement at the Dixon Psychiatric Unit to be appropriate. (*Id.*)  After evaluating the matter again, Dr. Fischer responded in the affirmative, asserting that in his opinion, it was medically appropriate for Plaintiff to remain at the Dixon Psychiatric Unit.  (*Id.*)  That same day, correctional officials notified Plaintiff that his housing unit had been reviewed, and that a determination had been made that he was properly housed in the Dixon Psychiatric Unit.  (*Id.*, ¶ 19.) Plaintiff was given the opportunity to contest his placement, but he signed a document confirming that he wished to stay at the Dixon Psychiatric Unit.  (*Id.*)

On August 27, 2015, correctional officials performed another housing assignment review for Plaintiff.  (*Id.*, ¶ 20.)  Dr. Fischer reiterated his opinion that Plaintiff was appropriately housed in the Dixon Psychiatric Unit.  (*Id.*)  Again, the administration informed Plaintiff that he was to remain at the Dixon Psychiatric Unit.  (*Id.*, ¶ 21.)  Again, Plaintiff signed a form reflecting that he wanted to stay in his current housing unit.  (*Id.*, ¶ 22.)

At a meeting on July 7, 2015, Plaintiff continued to express frustration over his incarceration, but he did not say that he had any suicidal thoughts.  (*Id.*, ¶ 30.) Plaintiff had begun to comply with his medication regimen, and he agreed to undergo a number of psychological tests.  (*Id.*)  Dr. Fischer continued Plaintiff's multiple prescriptions, with one adjustment.  (*Id.*)

The next day, Plaintiff asked to speak to Dr. Fischer again.  (*Id.*, ¶ 31.) Plaintiff stated that he wanted to stop taking all of his medications, and wondered whether he would encounter any problems if he did so.  (*Id.*)  Plaintiff also complained that the roster of his mental health care providers had changed.  (*Id.*)

11

Plaintiff indicated that he had difficulty talking with new people. (*Id.*) Plaintiff did not say that he was experiencing any suicidal thoughts at that time. (*Id.*) However, he threatened to hang himself if he were transferred to another prison. (*Id.*) Dr. Fischer continued Plaintiff's various medication prescriptions.

Dr. Fischer saw Plaintiff again two days later. (*Id.*, ¶ 32.) Although Plaintiff had expressed a desire to stay at the Psychiatric Unit earlier that week, he on that day intimated that he suspected the prison staff was trying to wrongfully keep him there. (*Id.*) Dr. Fischer attempted to reassure Plaintiff, telling him that he thought his confinement in the Dixon Psychiatric Unit was appropriate because he was receiving comprehensive mental health treatment there. (*Id.*)

On July 14, 2015, Plaintiff asked for an increase in the dosage of Gabapentin he was taking. (*Id.*, ¶ 33.) Plaintiff reported that he had been moved from A-Wing to B-Wing, but he did not know why. (*Id.*) Plaintiff was calm and cooperative at that time. (*Id.*) Dr. Fischer adjusted Plaintiff's Gabapentin, as requested, and continued his other medications. (*Id.*)

Dr. Fischer saw Plaintiff again the next day. (*Id.*, ¶ 34.) Plaintiff was still upset about his move to B-Wing and said that he did not like having a change in his surroundings. (*Id.*) Plaintiff said that he thought he had been moved because another inmate had falsely accused him of making threats. (*Id.*)

On July 28, 2015, Dr. Fischer discovered that Plaintiff was confined to a "mental health segregation cell." (*Id.*, ¶ 35.) Plaintiff confessed that he had not taken his medications for a few days. (*Id.*) He explained that he was saving his medications in order to take them prior to going to sleep. (*Id.*) He also declared that he believed that the Dixon Psychiatric Unit correctional officers were engaged in a conspiracy against him. (*Id.*) Plaintiff requested a transfer to the Pontiac Correctional Center. (*Id.*) Despite Plaintiff's segregation status, his mood seemed to have improved since Dr. Fischer's last visit. (*Id.*)

During an appointment on August 7, 2015, Plaintiff reported being unhappy over a recent change in his cell assignment in the Psychiatric Unit's C-Wing. (*Id.*, ¶

12

36.) Plaintiff did not voice any suicidal ideations. (*Id.*)

Dr. Fischer next saw Plaintiff on August 12, 2015. (*Id.*, ¶ 37.) At that interview, Plaintiff said that he had an urge to become violent toward the prison staff and other inmates. (*Id.*) Dr. Fischer and Plaintiff discussed ways to suppress such compulsions. (*Id.*) Dr. Fischer encouraged Plaintiff to talk to his other mental health care providers. (*Id.*)

Two days later, Plaintiff expressed his frustration that he was not a part of group therapy and that he was not seeing mental health care workers as often as he wanted. (*Id.*, ¶ 38.) He also stated that he did not believe that his medications were strong enough. (*Id.*) At that time, Plaintiff did not profess to be experiencing any suicidal thoughts. (*Id.*) Dr. Fischer adjusted Plaintiff's meds. (*Id.*)

By the time Plaintiff had his next appointment with Dr. Fischer on September 11, 2015, he was back in A-Wing. (*Id.*, ¶ 39.) Plaintiff requested more changes in his medications. (*Id.*) He asked for Clonazepam (or Klonopin, an anticonvulsant/antiepileptic drug also used as a sedative to treat panic attacks) on the basis that he did not believe his Lorazepam was working. (*Id.*) Plaintiff additionally requested purple Wellbutrin pills instead of red ones. (*Id.*) Dr. Fischer ascertained on reviewing Plaintiff's medication records that he was taking only his evening medications, not his morning meds. (*Id.*) Dr. Fischer honored Plaintiff's request to stop Lorazepam and start taking Clonazepam. (*Id.*) The doctor continued Plaintiff's other medications. (*Id.*)

At a meeting on September 22, 2015, Plaintiff expressed annoyance because his Wellbutrin pills were still red instead of the purple he had requested. (*Id.*, ¶ 40.) Plaintiff asked about increasing the dosage of his Trazodone, but then changed his mind because he feared that a large dose might make him feel sleepy in the morning. (*Id.*, ¶ 41.) The two also discussed adjusting Plaintiff's Clonazepam and Gabapentin in view of his skepticism whether the former medication was still working. (*Id.*) Dr. Fischer counseled Plaintiff about adhering to his medication schedule, as Plaintiff was refusing to take his Wellbutrin. (*Id.*)

Plaintiff additionally complained that he did not yet have a mattress since being released from segregation. (*Id.*, ¶ 40.) He stated his belief that the prison staff was intentionally trying to harm him by not giving him a mattress. (*Id.*) Plaintiff indicated that he would consider, as a "last resort," engaging in self-harm to get what he wanted. (*Id.*) At that time, Dr. Fischer continued all prescribed medications, deciding that their use remained appropriate for Plaintiff's mental health needs.

On September 30, 2015, Plaintiff had another appointment with Dr. Fischer. (*Id.*, ¶ 42.) Plaintiff again voiced his displeasure at receiving his Wellbutrin in crushed form. (*Id.*) Dr. Fischer explained anew that Plaintiff received crushed tablets in order to prevent him from hoarding and misusing his Wellbutrin. (*Id.*) Dr. Fischer dismissed Plaintiff's concerns that Wellbutrin somehow becomes "diluted" when crushed and dissolved in water. (*Id.*) According to Dr. Fischer, Wellbutrin's efficacy remains the same whether it is delivered in crushed or pill form. (*Id.*) Dr. Fischer reiterates in his affidavit that it is "medically appropriate" to provide Wellbutrin in crushed form. (*Id.*) Plaintiff insisted that he would take his Wellbutrin only if he received it in pill form. (*Id.*) He promised not to misuse the medication or give it to other inmates. (*Id.*) Dr. Fischer agreed to give Plaintiff another chance to take his Wellbutrin in pill form, but with the caveat that his medication would be crushed again if he misused it or gave it to other prisoners. (*Id.*)

On October 13, 2015, Dr. Fischer went to see Plaintiff after receiving a note from a nurse who had dispensed Plaintiff's medications the night before. (*Id.*, ¶ 44.) The nurse advised Dr. Fischer that she had given Plaintiff his evening medications in a medication cup. (*Id.*) She further reported that she and a correctional officer observed Plaintiff trying to hide his Wellbutrin by switching out his medication cup with an empty cup from a shelf in his cell. (*Id.*) The nurse therefore concluded that Plaintiff was not taking his Wellbutrin, but rather was keeping the pills when dispensed and stockpiling them. (*Id.*)

14

When Dr. Fischer confronted Plaintiff, the latter did not deny the nurse's accusations. (*Id.*, 45.) Dr. Fischer notified Plaintiff that his Wellbutrin would have to be crushed again. (*Id.*) Fischer did so out of concern that Plaintiff could overdose on hoarded medication or give it to other inmates. At the end of the conversation, Plaintiff said that he was feeling depressed and that he wanted to keep taking antidepressants, but he did not share any suicidal ideations. (*Id.*) Dr. Fischer increased the dosage of Plaintiff's Trazodone and reminded him that taking his Wellbutrin was very important. (*Id.*)

The next day, Dr. Fischer visited Plaintiff in the infirmary upon learning that he had jumped from the upper deck of his housing unit with a sheet tied around his neck. (*Id.*, ¶ 46.) Plaintiff shouted at Dr. Fischer and refused to speak to him. (*Id.*) Dr. Fischer continued Plaintiff's medical regimen. (*Id.*)

Dr. Fischer saw Plaintiff again the next day while he was on crisis watch. (*Id.*, ¶ 48.) Dr. Fischer overheard Plaintiff talking to another member of the health care staff (a Dr. Kane, who is not named as a Defendant). (*Id.*) Plaintiff related to Kane that he was very frustrated with his overall situation and with his treatment at the Dixon Correctional Center. (*Id.*) Plaintiff also said that he was hearing voices telling him to harm himself. (*Id.*) Plaintiff additionally advised Kane that he wanted a television set in his cell, or else he would hurt himself again. (*Id.*) Furthermore, Plaintiff complained that he did not want to take his medications any more because he disliked receiving disciplinary tickets for being non-compliant with his drug schedule. (*Id.*)

After Plaintiff stopped talking to Kane, Dr. Fischer attempted to engage him, but Plaintiff said that he did not want to speak with Fischer. (*Id.*, ¶ 48.) Plaintiff did, though, remark that he did not want to take his medications any longer. (*Id.*) However, Dr. Fischer refused to cancel Plaintiff's prescriptions. (*Id.*) Dr. Fischer discussed Plaintiff's circumstances with Dr. Kane in an effort to resolve the medication stand-off. (*Id.*) Dr. Fischer also spoke with the prison staff about how and when Plaintiff could purchase a TV. (*Id.*)

15

On October 16, 2015, Plaintiff told Dr. Fischer he was cold, and asked for the heat to be turned on. (*Id.*, 49.) Plaintiff also asked to speak to another mental health provider (Hvarre) regarding his recent disciplinary reports and the events of October 14th. (*Id.*) At that time, Plaintiff manifested no thoughts about self-harm. (*Id.*) Plaintiff commented that he felt taking his medications was too much trouble and that he did not believe that they worked. (*Id.*) Dr. Fischer advised Plaintiff that he had the right to refuse his medications, but that Fischer planned to continue prescribing them as he deemed appropriate.

That same day, Plaintiff was reassigned from Dr. Fischer's patient case load to that of Defendant Ramon Marquez, another staff psychiatrist at Dixon. (*Id.*, ¶ 50.)

Dr. Fischer declares that during the six months he shared responsibility for Plaintiff's care and treatment, he "[a]t no time … ignore[d] Plaintiff's complaints related to his mental health treatment or refuse[d] to treat his mental health conditions." (*Id.*) Dr. Fischer further maintains that he never withheld any medically necessary treatment. (*Id.*) Fischer avers that throughout his interactions with Plaintiff, he exercised his professional judgment as a trained psychiatrist. (*Id.*)

Dr. Marquez had an appointment with Plaintiff on November 9, 2015. (*Id.*, ¶ 51.) Plaintiff had a pleasant demeanor, but he admitted that he was at odds with the prison's correctional staff at that time, and that he was stressed about the prospect of what amounted to a life sentence. (*Id.*) Plaintiff appeared to be well-groomed, but he was depressed, angry, and suspicious of the correctional officers. (*Id.*) After reviewing Plaintiff's medications, Marquez decided to discontinue Clonazepam and start him on Ativan. (*Id.*) Marquez also assented to Plaintiff receiving his Wellbutrin in pill form instead of crushed form once again. (*Id.*)

At a meeting on December 19, 2015, Plaintiff contradictorily expressed both "content[ment]" and a depressed state. (*Id.*, ¶ 52.) During the appointment, he claimed that the pink (100 mg) Wellbutrin tablets did not work as well as the

16

purple, lower-dosed (75 mg) tablets. (*Id.*) Plaintiff requested purple Wellbutrin pills. According to Dr. Marquez, a medication's color does not change its efficacy. (*Id.*) Nevertheless, Dr. Marquez acceded to Plaintiff's request. (*Id.*, ¶ 53.) Dr. Marquez also continued Plaintiff's Gabapentin, Prozac, Trazodone, and Ativan. (*Id.*)

On January 14, 2016, Plaintiff requested a change in his medications because he was having muscle spasms while sleeping. (*Id.*, ¶ 54.) Plaintiff reported that he was otherwise doing well and experiencing no issues. (*Id.*) Plaintiff denied having any suicidal or homicidal thoughts at that time. (*Id.*) Dr. Marquez increased the dosage of Plaintiff's Gabapentin and lowered the dosage of his Prozac to address the muscle spasms. (*Id.*)

One week later, Dr. Marquez saw Plaintiff in connection with a "crisis intervention." (*Id.*, ¶ 55.) Correctional officials had just extracted Plaintiff from his cell because he was refusing to comply with orders after receiving a disciplinary ticket. (*Id.*) An officer who suspected Plaintiff of cheeking his Wellbutrin demanded that he open his mouth for a sweep of his oral cavity to make sure he had taken his medicine. (*Id.*) Plaintiff refused to do so. (*Id.*)

That incident renewed concerns about Plaintiff's "hoarding behavior." (*Id.*, ¶ 56.) As a result, Dr. Marquez gave Plaintiff the choice of receiving his Wellbutrin in crushed form or discontinuing it altogether. (*Id.*) Plaintiff chose to stop taking Wellbutrin. (*Id.*) Dr. Marquez therefore upped the dosage of Plaintiff's Gabapentin, and continued his other prescriptions. (*Id.*)

Thereafter, Plaintiff spent some time at the Cook County Jail and the Stateville Correctional Center before returning to the Dixon Correctional Center on or about March 26, 2016. (*Id.*, ¶ 57.)

Upon his return to Dixon, Plaintiff had an appointment with Dr. Marquez. (*Id.*) During the interview, Dr. Marquez formed the belief that Plaintiff was engaged in drug-seeking behavior. (*Id.*) Plaintiff requested specific dosages of medications known to be abused by and traded among inmates. (*Id.*) Plaintiff was

17

loud, angry, and threatening. (*Id.*) Furthermore, the nursing staff informed Dr. Marquez that Plaintiff had been caught cheeking his medications on several occasions. (*Id.*) Because Plaintiff refused to take his Wellbutrin in crushed form, Dr. Marquez discontinued the prescription. (*Id.*) Dr. Marquez renewed Plaintiff's prescriptions for Gabapentin, Trazodone, and Ativan. (*Id.*)

Plaintiff's medication records showed that in the month of April 2016, he refused his medications almost every day. (*Id.*, ¶ 58.)

At an appointment on May 2, 2016, Plaintiff requested a prescription for Benadryl to help him sleep. (*Id.*, ¶ 59.) Benadryl is another medication commonly hoarded, trafficked, and abused by inmates. (*Id.*) Dr. Marquez agreed to prescribe Plaintiff Benadryl, but only in crushed form and added to water to prevent him from cheeking the medication. (*Id.*) Plaintiff exploded in anger, threatened Dr. Marquez, and stormed away. (*Id.*) Dr. Marquez declined to prescribe Benadryl under the circumstances, but he adjusted and continued Plaintiff's other medications as he deemed appropriate. (*Id.*)

On May 11, 2016, Plaintiff had an altercation with the correctional staff and ended up being physically carried to his cell. (*Id.*, ¶ 60.) While being carried, Plaintiff managed to intentionally hit his head along the way. (*Id.*) Once in his cell, Plaintiff cut one of his wrists. (*Id.*)

The following morning, Plaintiff refused his medications and rejected treatment for his wrist wound. (*Id.*) He then "took his chuck-hole hostage." (*Id.*) Prison employees had to cuff Plaintiff's arms and feet in order to prevent him from following through on his threats to engage in further self-harm. (*Id.*) When Plaintiff threatened to continue his "rampage," Dr. Marquez decided to order, on an emergency basis, the forced administration of psychotropic medications. Dr. Marquez instructed that Plaintiff receive Haldol, Benadryl, and Ativan for three days. (*Id.*) Dr. Marquez did so in the hope of stabilizing Plaintiff's mental health condition.

Throughout May 2016, Plaintiff continued to refuse his regularly prescribed

18

medications on numerous occasions. (*Id.*)

When Dr. Marquez saw Plaintiff on June 20, 2016, he was in segregation. (*Id.*, ¶ 62.) Plaintiff said that he was trying to stay out of trouble, but he appeared to be depressed. (*Id.*) Dr. Marquez continued Plaintiff's medications at that time. (*Id.*)

On July 18, 2018, Dr. Marquez evaluated Plaintiff for borderline personality disorder (a condition characterized by difficulties regulating emotion, leading to impulsivity, poor self-image, stormy relationships, intense emotional responses to stressors, and often accompanied by dangerous behaviors such as self-harm, *see* "Borderline Personality Disorder," https://www.nami.org/learn-more/mental-health-conditions/borderline-personality-disorder (National Alliance on Mental Illness) (visited November 12, 2020)). Dr. Marquez observed that Plaintiff was filing grievances against Dr. Fischer and was refusing to see Marquez. (*Id.*)

Plaintiff was upset because Dr. Marquez would not restart his prescription for Wellbutrin. (*Id.*) Dr. Marquez reminded Plaintiff that even though Dr. Fischer had determined he was hoarding, cheeking, and trading his medications, Dr. Marquez had given him the opportunity to be trusted taking Wellbutrin, Benadryl, and Gabapentin. (*Id.*) Dr. Marquez advised Plaintiff that he had squandered that opportunity by refusing "tongue sweeps" and by cheeking his medications. (*Id.*) Dr. Marquez explained that this was why he would no longer prescribe Plaintiff Wellbutrin in pill form. (*Id.*) In addition, Dr. Marquez frankly stated that it was his belief that Plaintiff was filing grievances against him and requesting a new psychiatrist for a "secondary gain"—that is, to receive treatment from someone who was unaware of his cheeking and hoarding. (*Id.*, ¶ 64.) Concluding that Plaintiff was malingering in order to score recreational drugs, Dr. Marquez continued the same treatment schedule. (*Id.*)

In mid-August 2016, Dr. Marquez prescribed Plaintiff another anti-depressant, Celexa, instead of Prozac upon learning that Plaintiff had been refusing to take his Prozac. (*Id.*, ¶ 65.)

Dr. Marquez saw Plaintiff again on August 22, 2016. (*Id.*, ¶ 66.) As Dr. Marquez approached, he saw that Plaintiff was calm and enjoying a game of chess. (*Id.*) But as soon as Plaintiff saw Dr. Marquez, he became angry and argumentative. (*Id.*) Plaintiff admitted that he was not taking his latest-prescribed antidepressant, Celexa, because he had been on that medication before [and evidently did not like it]. (*Id.*) In fact, Dr. Marquez noted from Plaintiff's medication records that he had been refusing all of his medications for over a month. (*Id.*) At that time, Plaintiff shared no thoughts of harming himself or others. (*Id.*) Dr. Marquez thought that Plaintiff was demonstrating borderline personality disorder and faking some symptoms. (*Id.*) Dr. Marquez accommodated Plaintiff's request for a combination of Prozac and Celexa, confident that the drug combination would help him. (*Id.*) However, despite Plaintiff's express request for Prozac and Celexa, he refused to take them. (*Id.*)

Dr. Marquez saw Plaintiff again on October 3, 2016. (*Id.*, ¶ 67.) Plaintiff complained that the Celexa was making him tired. (*Id.*) Although Dr. Marquez thought Plaintiff's affect seemed "blunted," he was otherwise calm and he reported no suicidal or homicidal ideations. (*Id.*) Plaintiff requested a medication that would "give him a boost." (*Id.*) After discussing medication options, the two decided to stop the Celexa and try Prozac and Ativan. (*Id.*)

On November 5, 2016, Plaintiff refused to see Dr. Marquez for a scheduled morning appointment, but attempted to flag him down that afternoon to speak to him when he saw the doctor. (*Id.*, ¶ 68.) Dr. Marquez admonished Plaintiff that he had a poor concept of boundaries, and that he could not expect to see Marquez whenever it suited him. (*Id.*) Dr. Marquez emphasized that he never turned down requests to schedule an appointment, even though Plaintiff elected to skip some appointments. (*Id.*) Dr. Marquez additionally noted Plaintiff's persistent attempts to dictate his medication regimen, and to request medications that had been discontinued on the basis of hoarding, trading, and abuse.

On November 14, 2016, Plaintiff made an apparent suicide attempt by

hanging. (*Id.*, ¶¶ 69, 70.) After conducting an emergency consultation, Dr. Marquez authorized the involuntary administration of psychotropic medication for Plaintiff due to the urgency of the situation. (*Id.*, ¶ 69.) Plaintiff "refused to de-escalate his angry and self-injurious behavior." (*Id.*) Plaintiff threatened to find a way to "finish the job" and kill himself. (*Id.*) Plaintiff could not be talked out of his mood. (*Id.*) Plaintiff's medical charts reflected that he had not been taking his medications. (*Id.*) Hence, Dr. Marquez ordered the emergency involuntary administration of Prolixin (Fluphenazine, an antipsychotic medication for treating schizophrenia), Benadryl, and Ativan in order to calm him down and calm his agitated state. (*Id.*)

When Dr. Marquez went to see Plaintiff three days later, the inmate remained on crisis watch under continuous observation. (*Id.*, 70.) Plaintiff was still threatening to commit suicide if he were not cleared of wrongdoing. (*Id.*) At the time, Plaintiff was facing discipline for allegedly inciting fellow prisoners to refuse their medications. (*Id.*) Dr. Marquez noted Plaintiff's "long history of shady conduct," including claiming that mental health providers were not providing him with treatment while simultaneously refusing his medications. (*Id.*) Dr. Marquez further reminded Plaintiff that it was because he had written so many grievances against his mental health care providers that his case had been reassigned to Marquez's patient load. (*Id.*) Dr. Marquez additionally observed that Plaintiff continually "escalated[d] his behavior" when not given the medications he wanted. (*Id.*, ¶ 71.) Dr. Marquez also remarked that, though "very needy," Plaintiff constantly rejected the doctor's suggestions and recommendations. (*Id.*)

While Dr. Marquez judged Plaintiff to be calmer that day, the inmate still insisted that the prison staff was withholding treatment. (*Id.*, ¶ 72.) Plaintiff demanded to choose his medications, but Dr. Marquez told him that he could not be trusted with self-administration. (*Id.*) Plaintiff was angry, he exhibited mood swings and depression, and he was unable to entirely "de-escalate." (*Id.*) Because Plaintiff was asking for antidepressants and mood stabilizers but had declined to

adhere to his medication schedule on a regular basis, Dr. Marquez submitted Plaintiff's case for consideration by the Treatment Review Committee. (*Id.*)

On November 23, 2016, Dr. Marquez recorded that Plaintiff's course of enforced medications had provided him with "great benefit." (*Id.*, ¶ 73.)

However, after going without medications for just one day, Plaintiff returned to being angry, defiant, aggressive, and threatening suicide. (*Id.*) Plaintiff destroyed the heating unit in his cell, and then complained that his cell lacked heat. (*Id.*) Plaintiff also demolished his metal bed, removed the bolts, and swallowed them. (*Id.*) When Dr. Marquez next saw Plaintiff, he had just returned from an outside hospital where the bolts had been surgically removed. (*Id.*)

Dr. Marquez ordered another three days of enforced medications due to Plaintiff's dogged efforts to find something to swallow, his threats against a lieutenant, and his attempts to spit on the staff. (*Id.*) Plaintiff continued threatening to kill himself, and he claimed that it would be Dr. Marquez's fault if he succeeded. (*Id.*) Dr. Marquez completed the requisite paperwork for the emergency involuntary administration of Prolixin, Ativan, and Benadryl. (*Id.*) Dr. Marquez prescribed these drugs in order to help restore Plaintiff to a more stable state of mind. (*Id.*)

On November 28, 2016, Plaintiff attended a hearing before the Treatment Review Committee. (*Id.*, ¶ 75.) The Treatment Review Committee concurred with the involuntary administration of psychotropic medications. (*Id.*)

On December 15, 2016, Plaintiff was transferred to the mental health unit at the Pontiac Correctional Center. (*Id.*)

Dr. Marquez agrees with Dr. Fischer that it is "medically appropriate" to receive Wellbutrin in crushed form instead of pill form as needs dictate. (*Id.*, ¶ 76.) Crushing the pill does not change Wellbutrin's effectiveness. (*Id.*) Likewise, a pill's color does not change its efficacy. (*Id.*)

Dr. Marquez swears that he never ignored or refused to treat Plaintiff's mental health conditions. (*Id.*, ¶ 77.) Dr. Marquez declares that he at no time ever

22

withheld medically necessary treatment for Plaintiff. (*Id.*) Dr. Marquez states that he exercised his professional judgment as a psychiatrist at all times in treating Plaintiff. (*Id.*)

Plaintiff returned to the Dixon Correctional Center in or around March of 2018. (R. 72, Plaintiff's Change of Address Notice.)

Plaintiff's current psychiatrist is Dr. Arthur Doyle [who is not a Defendant in this action]. (R. 173, Defendants' SOF, ¶ 79.) As of the date Defendants filed their motion for summary judgment, Plaintiff was taking Geodon, Prozac, Tramadol, and Cogentin to treat his mental health conditions. (*Id.*, ¶ 78.) Plaintiff is or was on "enforced status" for Geodon due to his repeated suicide attempts and the number of times he has had to be on crisis watch. (*Id.*)

Plaintiff has a cell by himself in Dixon's Psychiatric Unit. (*Id.*, ¶ 80.) Plaintiff is afforded up to four hours a day in the day room. (*Id.*) During his free time, Plaintiff is also permitted to go to the gymnasium or out to the yard.

## VI.    Analysis

No material facts are in dispute, and Defendants have established that they are entitled to judgment as a matter of law.  Even viewing the record in the light most favorable to Plaintiff, the Court is satisfied that no reasonable trier of fact could conclude either that Plaintiff's incarceration at the Dixon Psychiatric Unit violates his constitutional rights or that Defendants have acted with deliberate indifference to his mental health needs.

### A.    There Is No Triable Issue as to Whether Plaintiff is Appropriately Housed in  Dixon's Psychiatric Unit.

First, neither of the two remaining Defendants has any power to order Plaintiff's transfer to another facility.  The only proper Defendant for purposes of injunctive relief would be IDOC Director John Baldwin.  *See, e.g., Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011) (proper defendant in a claim for injunctive relief is the government official responsible for ensuring any injunctive relief is carried out); *Gray v. McCaughtry*, 72 F. App'x 434, 437 (7th Cir. 2003) (unpublished opinion) (in prisoner 1983 action seeking to compel desired medical treatment, the proper parties were those state officials responsible for seeing that the court's order was carried out); *Mitchell v. Baker*, No. 13 CV 0860, 2016 WL 397678, at *4 (S.D. Ill. Feb. 2, 2016) (dismissing warden as defendant in civil rights action because she had no authority to transfer an inmate); *Connolly v. Clark*, No. 13 CV 3361, 2015 WL 5585668, at *1 (C.D. Ill. Sept. 21, 2015) (prisoner civil rights action concerning ophthalmological care) ("When a Plaintiff seeks injunctive relief, the proper defendant is the person with the responsibility to ensure that such relief is carried out, regardless of whether that defendant personally participated in the alleged constitutional violations") (citation omitted).

In the case currently before the Court, Dr. Fischer clarifies that he merely "recommend[ed]," as "medically appropriate," Plaintiff's transfer to the Dixon Psychiatric Unit, but that he was otherwise uninvolved in either Plaintiff's designation as a maximum security inmate or his move to the Psych wing.  (R. 173-

3, Declaration of Dr. Mark Fischer, ¶¶ 8, 9.) Dr. Marquez, in turn, did not become Plaintiff's treating psychiatrist until November 2015. (R. 173-4, Declaration of Ramon Marquez, ¶ 5.) Plaintiff settled with the only Defendants(s) who have authority to modify his security level or move him to a different facility.

In any event, Plaintiff has adduced no evidence to support his claim that his assignment to the Dixon Psychiatric Unit violates his constitutional rights. As the Court previously admonished Plaintiff, he has no constitutionally protected interest in choosing his place of confinement. *See* R. 126, Order of October 15, 2018, at p. 3 (Kapala, J.) (citing *Meachum v. Fano,* 427 U.S. 215, 225 (1976); *Knox v. Wainscott*, No. 03 CV 1429, 2003 WL 21148973, at *8 (N.D. Ill. May 14, 2003); *Obriecht v. Bartow*, No. 05 CV 0639, 2005 WL 1458214, at *1 (E.D. Wis. June 20, 2005) ("A state prisoner has no federal or constitutional right to choose the correctional facility where he will serve his sentence")). Prison officials may transfer an inmate "for any constitutionally permissible reason or for no reason at all." *Knox*, 2003 WL 21148973, at *8 (citing *Meachum,* 427 U.S. at 225 (*inter alia*)); *see also Williams v. Faulkner,* 837 F.2d 304, 309 (7th Cir. 1988) ("absent a constitutional, statutory, or regulatory bar, "a prisoner may be transferred for any reason, or for no reason at all."); *Moss v. Westerman*, No. 04 CV 0570, 2008 WL 5272174, at *4 (S.D. Ill. Dec. 17, 2008) (same) (citation omitted). Prison inmates may not dictate their place of incarceration.

Furthermore, the courts do not generally second-guess inmate housing decisions. It is not "the task of federal courts to oversee discretionary housing decisions made by state prison officials." *Del Rio v. Schwarzenegger*, No. 09 CV 0214, 2010 WL 347888, at *5 (C.D. Cal. Jan. 20, 2010) (collecting cases). Rather, "[i]t is well settled that the decision where to house inmates is at the core of prison administrators' expertise." *McKune v. Lile*, 536 U.S. 24, 38 (2002). Where a plaintiff requests an award of remedial relief that would require a federal court to interfere with the administration of a state prison, "appropriate consideration must be given to principles of federalism in determining the availability and scope of

[such] relief." *Rizzo v. Goode*, 423 U.S. 362, 379 (1976). The courts afford correctional administrators wide deference in day-to-day housing decisions. *Everett v. Baldwin*, No. 13 CV 4697, 2016 WL 8711476, at *11 (N.D. Ill. Jan. 15, 2016).

In the case at bar, there is no question whether Plaintiff belongs in a residential treatment unit. The parties agree that Plaintiff is seriously mentally ill. Among other conditions, Plaintiff suffers from bipolar disorder, major depression, anti-social personality disorder, adjustment disorder, and suicidal ideations. Defendants state without contradiction that residential treatment units are specifically equipped to handle seriously mentally ill prisoners by providing programs and access to staff not available at regular prisons. Inmates in residential treatment units have access to (1) psychologists, psychiatrists, social workers, and other mental health professionals, (2) therapeutic programs, and (3) medical treatment throughout the day. Due to his many mental health issues, Plaintiff has lived mostly in treatment units since his admission to IDOC custody in 2012. Plaintiff does not challenge the propriety of his confinement in a residential treatment unit; he seemingly takes issue only with being housed at the Dixon Psychiatric Unit.

Plaintiff does not—and cannot—disagree that his 70-year sentence for sexual predation necessarily triggered his reclassification as a maximum security prisoner. As with housing decisions, it is a well-settled principle that an inmate has no protected interest in keeping a particular security classification. *See, e.g., Tomaso v. McGinnis*, 970 F.2d 211, 212 (7th Cir. 1992) ("[P]risoners possess neither liberty nor property [interests] in their classifications and prison assignments") (internal citations omitted); *Henderson v. Schwochert*, No. 19 CV 0749, 2019 WL 5069003, at *6 (E.D. Wis. Oct. 9, 2019) ("Prisoners do not have a constitutional right to be assigned to a particular prison, security classification, or housing assignment") (citations omitted); *Bradley v. Wexford, Inc.*, No. 19 CV 0733, 2019 WL 3033675, at *6 (S.D. Ill. July 11, 2019) ("An inmate does not have a protected interest in a particular classification") (citations omitted); *Talley v. Lee*, No. 15 CV 1032, 2015

WL 13741224, at *4 (S.D. Ill. Oct. 14, 2015), *report and recommendation adopted,* No. 15 CV 1032, 2016 WL 2605036 (S.D. Ill. May 6, 2016) (prisoner's "desire to be in a particular prison is secondary to the Illinois Department of Correction's interest in housing him in a facility that is in line with his security classification"); *Fields v. Cartwright*, No. 13 CV 1305, 2014 WL 201531, at *2 (S.D. Ill. Jan. 17, 2014) ("No constitutional claim arises from Plaintiff's reclassification as a 'high' escape risk"). Nor is there any dispute that the Dixon Psychiatric Unit is the IDOC's only residential treatment facility designated as maximum security.

Moreover, Defendants have furnished ample grounds for lodging Plaintiff at the Dixon Psychiatric Unit irrespective of the fact that his maximum security, "seriously mentally ill" status renders him ineligible for placement at another facility. Defendants already demonstrated in their preliminary injunction briefs that Plaintiff's poor adjustment history, incidents of self-harm, and "well-documented history of violence towards both other inmates and IDOC staff" all limit his housing options. (R. 126, Order of November 15, 2018, at p. 4.) Also, Plaintiff's file contains "keep separate" orders from various known enemies at other institutions. (*Id.*). What is more, Plaintiff requires close monitoring due to his record of refusing, hoarding, and recreationally abusing his prescribed medications. (*Id.*). Defendants have shown that Plaintiff properly belongs at the Dixon Psychiatric Unit, while Plaintiff, in contrast, has failed to make any showing that he should—or even could—be housed anywhere else.

In addition, there is no triable issue as to whether Plaintiff's living conditions violate his constitutional rights. Certainly, incarcerated persons are entitled to confinement under humane conditions that satisfy "basic human needs." *Rice ex rel. Rice v. Correctional Medical Services*, 675 F.3d 650, 664 (7th Cir. 2012) (citations omitted). "The State must provide an inmate with a 'healthy, habitable environment.'" *French v. Owens*, 777 F.2d 1250, 1255 (7th Cir. 1985) (citations omitted). Correctional officials violate the Eighth Amendment when they show deliberate indifference to adverse conditions that deny "the minimal civilized

27

measure of life's necessities." *Budd v. Motley*, 711 F.3d 840, 842 (7th Cir. 2013) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). "Life's basic necessities" typically refers to such needs as "adequate food, clothing, shelter, and medical care." *Hardeman v. Curran*, 933 F.3d 816, 827 (7th Cir. 2019) (concurring opinion) (quoting *Farmer*, 511 U.S. at 832); *see also Brooks v. City of Chicago*, No. 13 CV 3090, 2018 WL 4404626, at *2 (N.D. Ill. Sept. 17, 2018) (same, adding "reasonable protection" as another basic need) (citation omitted).

Defendants state, without contradiction, that Dixon's Special Treatment Center and its Psychiatric Unit are virtually identical and offer the same programs, services, and level of medical and mental health care. The only difference appears to be that the latter is designated as a maximum security facility. But "[t]o the extent that [prison] conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981); *Isby v. Brown*, 856 F.3d 508, 522 (7th Cir. 2017) (same ) (citation omitted). "[P]rison conditions may be uncomfortable, even harsh, without being inhumane." *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 666 (7th Cir. 2012) (citing *Farmer,* 511 U.S. at 832); *Townsend v. Fuchs*, 522 F.3d 765, 771 (7th Cir. 2008) ("[W]e have repeatedly determined that even extremely harsh prison conditions may not be so 'atypical' as to create [a constitutionally protected] interest"). "[I]inmates cannot expect the amenities, conveniences and services of a good hotel." *Mims v. Hardy*, No. 11 CV 6794, 2012 WL 2116100, at *3 (N.D. Ill. June 11, 2012) (quoting *Harris v. Fleming,* 839 F.2d 1232, 1235 (7th Cir. 1988)).

It may that Plaintiff faces certain limitations on his freedom as a maximum security inmate that he would not experience as a medium or minimum security inmate. But he has not described what deprivations he faces at all, let alone shown that stricter controls in the Psychiatric Unit or other hardships have resulted in the denial of his basic needs (especially and including adequate medical treatment, to be discussed *infra*). In denying Plaintiff's motion for a preliminary injunction, the

28

Court expressly invited him to elaborate on his conclusory claims that the conditions of his confinement in the Dixon Psychiatric Unit were unduly harsh. *See* R. 126, Order of October 15, 2018, at p. 5. Plaintiff spurned that opportunity. The only difference between Dixon's Psychiatric Unit and its Special Treatment Center reflected in the record is that Plaintiff gets to have his own room in the Psych Unit.

Because Plaintiff has also had multiple chances to seek review of his placement, he cannot reasonably argue a denial of due process. Defendants report that inmates may, at any time, request a review of their placement through at least two different channels. (R. 173, Defendants' SOF, ¶ 5.) And with or without a request, all inmates housed in a residential treatment unit undergo placement review at least every six months. (*Id.*) In fact, during the time period that is the subject of the summary judgment record, Plaintiff on various occasions declined to appeal placement decisions, and even insisted at least once on *staying* at the Dixon Psychiatric Unit. (*Id.*, ¶¶ 19, 21, 22, 31.) Plaintiff's periodic and inconsistent desire for a transfer seems to change on a whim, but the IDOC cannot be expected to accommodate an inmate's every caprice, particularly the passing fancies of a mentally ill inmate who admits to having impulse control disorder. Although given some three and a half years (and three attorneys) to gather evidence showing that living conditions at the Dixon Correctional Center are fundamentally inhumane, Plaintiff is unable to do so.

In short, the remaining Defendants in this case do not have authority over either Plaintiff's security classification or his prison assignment. Regardless, even viewed in the light most favorable to Plaintiff, the record does not support an inference that the conditions of his confinement violate his constitutional rights, or that he has no due process protections. Plaintiff has no constitutional right to particular housing, and the Court's review of Plaintiff's placement is limited. Defendants have established that Plaintiff properly belongs in a residential treatment unit, that the Dixon Psychiatric Unit is the only facility that is qualified to house him, and that his basic needs are met there. The Court encourages

Plaintiff to obey his doctors' orders, to strictly follow his medication regimen, and to comply with prison rules and regulations. Only in this manner may Plaintiff achieve a lower security designation and enjoy greater freedoms.

**B.    There Is No Question for the Jury as to Whether Plaintiff Has Received Constitutionally Adequate Medical (Mental Health) Care**

The record does not support a finding that Defendants have provided constitutionally deficient mental health treatment. Defendants have demonstrated that they have followed a treatment program that they deem medically appropriate, and Plaintiff has provided no evidence to counter their position.

Correctional officials and health care providers may not act with deliberate indifference to an inmate's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Fields v. Smith*, 653 F.3d 550, 554 (7th Cir. 2011). Prison employees must provide inmates with medical care that is adequate in light of the severity of the condition and professional norms. *See, e.g., Farmer,* 511 U.S. at 832; *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011). The fact that an inmate has received some treatment does not necessarily defeat a claim for deliberate indifference. "'Blatantly inappropriate' medical treatment" or persisting with a course of treatment health care providers know to be ineffective may be actionable under 42 U.S.C. § 1983. *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015); *see also Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) (delays in treatment, refusal to send a prisoner to a specialist, and "choos[ing] an easier and less efficacious treatment without exercising professional judgment" can demonstrate deliberate indifference).

It must be emphasized that neither medical malpractice nor a mere disagreement with a doctor's medical judgment amounts to deliberate indifference. *Estelle*, 429 U.S. at 106; *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010). "[A] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Sain v.*

*Wood,* 512 F.3d 886, 894-95 (7th Cir. 2008)). For liability to attach under Section 1983, the medical professional's decisions must be "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 895 (citation and internal quotation marks omitted); *Coe v. Atkins*, No. 15 CV 6869, 2017 WL 2080358, at *2 (N.D. Ill. May 15, 2017) (same).

A denial-of-adequate-medical-care claim under Section 1983 requires proof that the prisoner suffered from "(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent." *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019) (quoting *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008)). This type of case is "better framed 'not as] deliberate indifference to a serious medical need,' but as a challenge to 'a deliberate decision by a doctor to treat a medical need in a particular manner.'" *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019) (quoting *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996)).

In the instant case, Defendants do not dispute that Plaintiff suffers from objectively serious medical conditions. *See, e.g., Sanville v. McCaughtry*, 266 F.3d 724, 734 (7th Cir. 2001) (recognizing that "[t]he need for a mental illness to be treated could certainly be considered a serious medical need"); *Jackson v. Baldwin*, No. 19 CV 50055, 2019 WL 2576538, at *1 (N.D. Ill. June 24, 2019) ("Mental health conditions are a type of serious medical need"); *Shultz v. Dart*, No. 13 CV 3641, 2013 WL 5873325, at *4 (N.D. Ill. Oct. 31, 2013) (acknowledging that mental health disorders may constitute serious medical needs); *Smith v. Hallberg,* 11 CV 0188, 2012 WL 4461704, at *8 (N.D. Ill. Sept. 25, 2012) ("[m]ental health issues such as [the severe depressions] suffered by Plaintiff ... have been recognized by the courts to be an objectively serious medical condition"). Thus, the Court need examine only the subjective component in this case.

### 1. Plaintiff's Basic Mental Health Needs Are Met

Plaintiff has not met his burden of showing that either Defendant has

31

disregarded his essential mental health needs. Plaintiff is housed in a unit specifically dedicated to providing mental health treatment. He has access not just to Defendants, but to a myriad of other health care professionals, including but not limited to the many individuals mentioned in Defendants' Statement of Facts. He may participate, for hours a day, in group and one-on-one therapy.

Plaintiff offers no basis for questioning his medical care. As noted in previous paragraphs, Defendants are entitled to deference in treatment decisions "unless no minimally competent professional would have so responded under those circumstances." *Roe*, 631 F.3d at 857. Plaintiff should also be aware that the mere inability to effect a final "cure" for his mental health afflictions is not evidence of deliberate indifference. *See, e.g., Riley El v. Godinez*, No. 13 CV 5768, 2016 WL 4505038, at *14 (N.D. Ill. Aug. 29, 2016) (citations omitted). Rather, it is the goal of medicine to move toward relief from symptoms and the successful management of a mental health condition. https://www.nami.org/FAQ/General-Information-FAQ/Can-people-recover-from-mental-illness-Is-there-a-cure? (National Alliance on Mental Illness) (visited November 12, 2019). Unfortunately, Defendants can only help Plaintiff adjust to living with his disorders, not entirely recover from them.

Most often, this type of medical dispute arises when a medical provider is alleged to have chosen a treatment—or lack thereof—based on cost considerations rather than medical judgment. *Rasho*, 856 F.3d at 476 (citations omitted). The choice of "an easier and less efficacious treatment without exercising professional judgment" can constitute deliberate indifference. *Rasho v. Elyea*, 856 F.3d 469, 476 (7th Cir. 2017) (citing *Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016)). "But a similar concern arises if a medical provider bases his or her treatment decision on personal prejudices or animosity." *Id.* In either circumstance, the medical provider may violate the patient-inmate's constitutional rights by failing to exercise medical judgment at all. *Id.* (denying summary judgment where there was jury question as to whether defendants transferred prisoner out of mental health unit in retaliation for his grievances and lawsuits rather than based on their medical judgment) (citing

*Roe*, 631 F.3d at 863).

In the case at bar, Defendants are intimately familiar with Plaintiff's psychiatric issues because they have had an ongoing relationship with him, meeting with him regularly and discussing his needs. Defendants have also conferred with colleagues about how best to manage Plaintiff's treatment. (Defendants' SOF, ¶ 72.) At least one medical review committee concurred in Defendants' treatment decisions when consulted. (*Id.*, ¶ 75.) Plaintiff's quixotic inclinations and temperamental requests based on day-to-day mood changes are not enough for a reasonable trier of fact to doubt the quality of his mental health care.

Plaintiff has likewise submitted no competent evidence that would tend to call into question the suitability of his drug regimen. The Court of Appeals for this circuit has "routinely .. rejected claims … where a prisoner's claim is based on a preference for one medication over another unless there is evidence of a *substantial* departure from acceptable professional judgment. *Lockett*, 937 F.3d at 1024 (emphasis in original) (noting that inmate's medical history, record of substance abuse, and the risks associated with opioid abuse in general and in the prison context in particular were proper considerations in determining what pain medications to prescribe). Defendants have demonstrated that they have exercised their professional judgment in prescribing certain psychotropic medications, and they have adjusted those drugs and their dosages based upon Plaintiff's experiences and feedback (and also, to some degree, based on his documented misuse of certain meds). Defendants have also prescribed "non-formulary" medications, notwithstanding their presumed extra cost to the State. (*Id.*, ¶ 25.)

Indeed, the record suggests that Plaintiff tends to go off the rails whenever he stops taking his prescribed medications. And the record in no way supports an inference that Defendants have acted maliciously. To the contrary, Defendants have shown remarkable patience and forbearance with an exceedingly difficult patient who must cause a great deal of frustration.

Furthermore, Plaintiff is mistaken in his conviction that crushing Wellbutrin

33

or formulating it in a different color than he is used to in any way affects its potency. Plaintiff is not competent to diagnose himself [or to testify about a drug's scientific benefits], and he has no right to choose his own treatment. *See, e.g., Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012); *Rodriguez v. Hardy*, No. 11 CV 5514, 2013 WL 361918, at *3 (N.D. Ill. Jan. 28, 2013) ("A prisoner has no right to choose his course of treatment") (citing *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008)). While Plaintiff has an unquestioned general right to refuse medical treatment under normal [non-emergency] circumstances, *see Knight v. Grossman*, No. 19-1740, 2019 WL 5608177, at *5 (7th Cir. Oct. 31, 2019), his claim that Defendants have provided ineffective treatment cannot be reconciled with his chronic refusal to take his prescribed medications as directed. Based on the evidence in this record, no reasonable jury could find that Defendants' treatment has substantially deviated from accepted medical practices, is not based on professional judgment, or that Defendants have persisted in a course of treatment known to be ineffectual.

## 2. Defendants Have Not Acted with Deliberate Indifference to Plaintiff's Suicide Attempts

Defendants have shown that they have responded appropriately on those occasions when Plaintiff has stopped taking his psychotropic medications and has threatened or engaged in self-harm. Of course, "the risk of suicide is an objectively serious medical condition, and it is well established that inmates have the right to be free from deliberate indifference to this risk while in custody." *Lisle v. Welborn*, 933 F.3d 705, 716 (7th Cir. 2019) (citing *Estate of Clark v. Walker*, 865 F.3d 544, 551 (7th Cir. 2017)). "Deliberate indifference to a risk of suicide is present when an official is subjectively 'aware of the significant likelihood that an inmate may imminently seek to take his own life' yet 'fail[s] to take reasonable steps to prevent the inmate from performing the act.'" *Pittman ex rel. Hamilton v. Cty. of Madison, Ill.*, 746 F.3d 766, 775-76 (7th Cir. 2014) (quoting *Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006)).

34

The record shows that Defendants have responded reasonably to Plaintiff's threats and acts of self-harm. Defendants have placed Plaintiff on crisis watch to ensure his safety, authorized the involuntary administration of psychotropic medications to stabilize his condition, and met with him to discuss problems and possible solutions. Plaintiff's medical records reflect that his enforced medications have provided him with "great benefit." (Defendants' SOF, ¶ 72.)

Precedent teaches that these cautionary measures amounting to professional judgment satisfy constitutional requirements. *Compare Conner v. Rubin-Asch*, No. 19-1626, 2019 WL 5690626, at *2 (7th Cir. Nov. 4, 2019) (unpublished opinion) (ruling that a reasonable jury could not find that prison psychologist disregarded a known, substantial risk of harm because defendant made a "reasoned decision" to release plaintiff from clinical observation as safe and the best choice for his mental health needs because the psychologist did not believe that plaintiff's threats and attempts at self-harm were genuine); *Balsewicz v. Blumer*, No. 19-1619, 2019 WL 4566895 (7th Cir. Sept. 20, 2019) (unpublished opinion) (holding that there was insufficient evidence to create a factual issue of deliberate indifference to suicide risk where correctional officials ordered frequent monitoring of inmate who threatened suicide, even though they mistakenly allowed her to wear clothes that she then used to try to hang herself on one occasion and used her eyeglasses to cut herself on another occasion); *Kupsky v. McLaren*, 748 F. App'x 74, 76 (7th Cir. 2019) (unpublished opinion) (complaint failed to state a claim against prison medical staff where plaintiff, by his own admission, stated that they placed him on observation status "multiple times" upon his threats of self-harm because "the Eighth Amendment requires only that the defendants take reasonable steps....") (citation omitted); *Payette v. Dickman*, 394 F. App'x 297 (7th Cir. 2010) (unpublished opinion) affirming jury verdict in favor of correctional officials on deliberate indifference claim where they followed the recommendations of mental health professionals for isolation and suicide watch, arranged for medical care after inmate's suicide attempts, and scheduled inmate to meet with mental health staff

at regular appointments). Defendants could not entirely eliminate all conceivable means of self-harm without taking extreme measures that would themselves undoubtedly violate the Constitution.

The Court need not decide whether Plaintiff has endeavored to weaponize threats of suicide in order to manipulate correctional officials. The Court finds only that Defendants have treated Plaintiff's purported threats and acts of self-harm as genuine medical emergencies, and taken corresponding, practical steps to safeguard and stabilize him . There is simply no evidence whatsoever that Defendants have ignored Plaintiff's mental health care emergencies, acted out of spite, made treatment decisions solely on the basis of cost, or otherwise responded inappropriately to his thoughts and acts of self-harm.

## VII. Conclusion

For all of the foregoing reasons, the Court grants Defendants' uncontested motion for summary judgment [R. 170]. There is no genuine dispute as to any material fact, and Defendants have established that they are entitled to judgment as a matter of law. Defendants have shown that Plaintiff is a maximum security inmate who needs close supervision and intensive mental health treatment. Furthermore, the record firmly establishes that Plaintiff is appropriately housed at the Dixon Psychiatric Unit, where he receives ample and ongoing mental health care treatment, including psychotropic medications, counseling, and therapy, in a patient setting. Plaintiff has failed to meet his burden of showing that there is a triable jury question as to any of his challenges against his medical care and living conditions.

The Court directs the Clerk to enter final judgment in favor of Defendants pursuant to Fed. R. Civ. P. 56. Civil case closed. The status conference previously scheduled for January 22, 2020, at 8:45 a.m. is vacated. The Court reminds Plaintiff that he is foreclosed from filing a notice of appeal because, in connection with his earlier interlocutory appeal in this case, the U.S. Court of Appeals for the Seventh Circuit barred him from filing any new lawsuits or appeals. *See Boykin v.*

36

*Baldwin*, Case No. 16 CV 50160 (N.D. Ill.) (U.S.C.A. No. 18-3346), Order of January 25, 2019 (7th Cir.) (instructing "the clerks of all federal courts in this circuit [to] return unfiled any papers submitted either directly or indirectly by [Mr. Boykin] or on his behalf").

ENTERED

_____

Honorable Thomas M. Durkin
United States District Judge

Dated: 11/18/2019